Section 3406B.2 directs the Secretary of the Interior to dedicate and manage 800,000 acre feet of Central Valley project yield for three purposes. The first, fish, wildlife and habitat restoration purposes and measures authorized by the title. Second, to assist the State of California in its efforts to protect. We know what the statute says. Let me ask you a quick question. When the record is it set forth how the CBP waters are either connected to the water agencies that you represent or otherwise accounted for as B2 yield? Well, Your Honor, if you're going to the question of standing, the district court found that the water agencies had demonstrated harm and the potential for future harm. The district court found, and please remember... In other words, you're saying that the federal agencies conceded that issue and therefore you don't have to refer to it, so I should ask... No, Your Honor, what I'm saying is that the district court cited to declarations of Jim Snow, who was a Deputy General Manager for Westlands Water District, and cited to the declaration of Dan Nelson, who is the Executive Director of the San Luis and Delta Mendoza Water Authority, both of whom described the harm resulting from the accounting that occurred in 2004. Well, specifically we're talking now about the June 2004, not all the 2004 because obviously there was the September and August releases which your side won on in front of the district court, so that's out. Okay, looking at the June releases, how does your client have standing insofar as those releases are concerned? For example, there's reference in the record that the new Malonis, if I pronounced that correctly, is not hydrologically integrated with the rest of this CVP and has very little yield. Therefore, if there were releases from that facility, how is your client adversely affected? Well, Your Honor, in fact, I believe that that is an erroneous statement. New Malonis Reservoir is hydrologically connected to the rest of the CVP. In fact, the original calculation of yield that was performed by the Bureau of Reclamation included in the yield for purposes of dedication, the yield of New Malonis Reservoir, and in prior years, and in fact in 2004, releases from New Malonis were counted toward the 800,000 acre feet. The 800,000 feet doesn't necessarily show your client would necessarily benefit per se. Well, Your Honor, as You're saying that that's what the federal agencies conceded. No, what I'm saying, Your Honor, is that as Mr. Snow described, it is a zero-sum game. If project water is used for one purpose, it will, as a matter of fact, as a matter of reality, affect the availability of water for other purposes. In 2004, our allocation was 70%. Had Reclamation accounted for the dedication and management of CVP water appropriately, it would have reduced the amount of water it used for fish and wildlife purposes, and as a result, more water would have been made available for allocation to CVP contractors, including those represented here. But, Your Honor, I'd like to go to the heart of the question, because as an example, what's being asserted is that the releases that were made didn't further the primary purposes of the Act. And really, what the government and the environmental interveners would have this Court believe is that Interior has discretion to create hierarchies within hierarchies within hierarchies. Is that what this Court said? No, Your Honor. Actually, this Court did not say that. What this Court said was that there is a hierarchy of purposes within the statute, and the first hierarchy is the dedication and management of CVP water for fish, wildlife, and habitat restoration purposes and measures authorized by the title. That is the first hierarchy. So then the question becomes, if they're dedicating water for that purpose, for the purpose of fish, wildlife, habitat restoration purposes and measures authorized by the Act, does it have to be counted toward the 800,000 acre feet limit in the project? Isn't the only — isn't there a specific reference to the improvement of — and I mispronounce this all the time — Anadromous. Anadromous. I was going to say adromous, but anadromous fish. Isn't that the only thing that's referenced specifically, saying that that is the — has to be used for the set-aside? To the contrary, Your Honor. There is no place in the statute, and there is no place in the District Court's decision, and there is no place in this Court's decision where this Court has found — What about B-1-B? Isn't that where it specifically says it? No, Your Honor. What — B-1-B is one measure of the fish, wildlife, and habitat restoration purposes — I'm not saying that the environmental appellees are correct in their interpretation, but the District Court said that, you know, there is this purpose. What the District Court said was that the hierarchy of purposes related to the measures described in Section 3406B — And, Your Honor, we would submit that the District Court was in error when it said that. This statute provides — changes the purposes for the act, for the operation of the CBP, excuse me. And among those purposes are mitigation, protection of fish, and other environmental uses. But, Your Honor — Mr. Bermion, I wonder if I could just go back a little bit. This is slightly tangential to what Judge Wu indicated. I want to get back to some basics here in this very long-running case, which has been 11 years in the process so far. As I understand it, the Bay Institute of San Francisco, as you know, involved two of our cases, set forth this Court's position with respect to — Do you agree with that? No, Your Honor, I don't agree with that. What do you think that case determined? I think, Your Honor, that case determined a number of things. It did determine that within the statute there is a hierarchy. And what the Court said was that the primary purpose for the management of the 800,000 acre feet is to implement the fish, wildlife, and habitat restoration purposes and measures authorized by the act. The Court did not address the issue that is presented here. Here we have actions that were developed to implement the fish, wildlife, and habitat restoration purposes and measures. I'm getting ahead of the point I want to get to, and I appreciate that we'll get to that. But do you believe — taking for a moment your construction of our Court's decisions in these two unpublished opinions — do you believe that the law of the case requires us to follow those two decisions? Your Honor, the law of the case requires that you follow the prior decisions of this Court. However, there is nowhere in the decisions, the prior decisions of this Court — and I would challenge the environmental intervenors, the defendant intervenors, or the government to point to any place in this Court's prior decisions where this Court said that the primary purpose of CVPIA, of the dedication of this 800,000 acre feet, is to implement the anatomous fish recovery plan or program. It is nowhere in this Court's prior decisions. I take your point on that, that you construe those two decisions to mean a particular thing. But whatever they said, we're bound by that. Are we not in this case? Yes, Your Honor. To the degree that it applies to the facts of this case. To the degree that it applies to the facts of this case. But let's go to the facts of this case. Before we do that, I want to get to the second point, which is the District Court took the statute and took what our Court had said and construed what it understood our Court to have said and what the Congress had said. And what's your understanding of what the District Court concluded that was? And, Your Honor, let's assume hypothetically that that is the direction that this Court provided to the District Court. I'm not saying that it is, but let's assume that it were. We still win. And let me explain why. The government, I said earlier, the government wants to create hierarchies within hierarchies. I would ask the Court to look at page 35 of the government's brief. Actually, this starts on page 34. What the government says is, in this case, for instance, the June releases at issue presumably provided at least some amount of benefit to species that would have been in the Delta, San Francisco Bay, or lower San Joaquin River in June, such as sturgeon or smelt. See declaration of Christina Swanson, an expert that was relied upon by the defendants in intervention, where Dr. Swanson says, The Delta outflow objective primarily benefits other non-salmonid fish species, including white sturgeon, etc. Then the government goes on to say, but to say that these releases had to be charged against the 800,000 acre feet of B2 water, even where that would preclude Interior from taking other actions that are more directly related to the statute's directive to double the natural production of salmon and other anatomous fish is to destroy the discretion that this Court was so careful to preserve. Again, you're going a little bit beyond. I just want to be sure that you are, what you understand the District Court to have said, you've told us that. Do you agree with the District Court's standard? No. And why not? Because there is nothing in the statute that says that the action to be counted against B2 has to predominantly serve the primary purpose. And so I think, Your Honor, the appropriate standard is that if the action is taken to serve the primary purpose, which is the case here, then it should be counted. Notwithstanding the fact that it was subsequently incorporated into a water quality decision adopted by the State Water Resources Control Board. So basically, it's the idea of predominantly as opposed to primary. And your argument, I gather, taking it from there, is that even if you do apply the District Court's reasoning, some of the data you cited, in addition, I would indicate the guidance memo regarding 1995, and the, I guess also the, I guess 1995 WQCP actions, would tend to show that you are correct in even applying the District Court's measurement that the 9,100 acre feet was improperly allocated. Is that right? That is correct, Your Honor. And it goes back to the point I was trying to make with respect to the government's brief. What they say is this action benefits sturgeon, which, by the way, is defined by the Act as an anadromous fish. But it doesn't protect what they think is the best anadromous fish, and that is Chinook salmon. And... Why isn't that within the discretion of the agency? Your Honor, what is within the discretion of the agency... In the prior decision. Isn't this basically the same argument that you raised last time and lost on already? No, absolutely not, Your Honor. It is not the same argument. What we argued in the last case is that all of the... You couldn't consider waters releasing for purposes of the ESA and water releases for the 1995 WQCP. You lost on that. This is basically the same thing. You're saying, well, the water that was released does help the 1995 WQCP, and it does help with the Endangered Species Act, and so therefore, since it has some positive effect in that regard, which includes sturgeons, but we can ignore salmon at this point in time. No, Your Honor. You can go count salmon. No, we're not saying that. The government's saying that. And I think, Your Honor... What's the government wrong in saying that? Well, what the government says for purposes of this litigation is different than what the government has said in every other document that describes their management of this water. And, again, what I'd like to do, Your Honor... Doesn't your brief concede that this was sort of an unusual situation, given the very large releases that were done in April and May prior to this point in time, and the realization by the government that if these releases were to continue and be counted the same way, that there would not be any waters left for protection of salmonoid species? Well, first, Your Honor, it's not salmonid species. It's anadromous species. You're adding words to the statute, and that's what the government wants you to do. The statute says the primary purpose, and this Court said... It was an anadromous species. Salmon is one species of anadromous fish, but so are sturgeon. The Act specifically says sturgeon are anadromous fish. But let me respond to your question, Your Honor. In terms of the numbers of each of the species that are sought to be protected, sturgeon's quite low, salmon's quite high. So, therefore, if they wanted to extend the protection to salmon, why is that a problem? Because the statute says you have 800,000 acre-feet of water to protect anadromous... Well, actually, it doesn't say that. It doesn't say that. It says you have 800,000 acre-feet to implement the fish, wildlife, and habitat restoration purposes authorized by the Act. And what they want to say is it's anadromous, and even within anadromous, salmon have priority. And the statute does not give them that discretion, nor does this Court. But, again, it's not us that's saying it, Your Honor. The words used by Interior itself. And what I would like to do is refer the Court to the November 22, 2004 letter from the Fish and Wildlife Service and Reclamation to the State of California describing proposed changes to the B2 policy. And in there, what they say is the 1995 Water Quality Control Plan prescribes numerous actions that were developed in 1994 by Interior, working in consultation with the State to help restore delta fisheries, including anadromous fish. In fact, these fishery actions were included in the 1995 Water Quality Control Plan at the request of Interior and other signatories to the Bay Delta Accord. Counting CVP water used for 1995 Water Quality Control Plan fishery actions, which further the CVPIA's primary restoration purposes towards Interior's B2 obligation is consistent with the priority of uses prescribed by the Act. Those are the words of the Department of the Interior, not us. May I ask you, do you disagree that the June 2004 releases from Nimbus and New Melones, if I've pronounced that correctly, were done pursuant to the delta outflow and also the Vernalis flow obligations? They were done pursuant to the Bay Delta Accord, which was developed by Interior and which was then incorporated into the 1995 Water Quality Control Plan at Interior's request. Clearly, Congress contemplated that actions could serve both purposes concurrently. Could implement the fish, wildlife, and habitat restoration measures authorized by the Act and could help the State of California assist in meeting obligations to protect the Bay Delta. I'll reserve the last, excuse me. You cited the November 22, 2004 letter and I would also refer to the 2003 guidance memo. These seem to articulate the position of Interior as of the time that the water was released. After the litigation got going, it seemed like there was a post hoc rationalization that kind of worked backwards to explain it in a different way. What's your position about the documents you cited, the 2004 November 22 document and the guidance memo? What credence, if any, what binding effect, if any, on the intent of Interior should those play? Since there's clearly an inconsistency between what the government said after these memos and before. Your Honor, the discretion to implement the Act is delegated by Congress to the Secretary. The Secretary has delegated that discretion to these two individuals, the Regional Director of the Bureau of Reclamation and what was then the manager of the area office for the Fish and Wildlife Service. These are the gentlemen who were charged with interpreting what this court did and that was the statement that they made. Oh, they're bound by that? They are bound by it, yes, Your Honor. And the post hoc rationalizations should not persuade this court. I'll reserve the balance of my time. Thank you. Well, we've taken you 30 seconds left. I suspect we're going to hear enough from the government that we'll want to give you more than 30 seconds. We'll make sure you get to say what you need to say. Thank you, Judge Fletcher. May it please the Court, I am David Shilton, representing the Department of the Interior. I will be sharing my time with Ms. Kohler, who represents the environmental and fisheries plaintiffs. We had agreed on 10 and 5, but with 20 minutes I plan to take 12 or 13. So I will turn first to the standing issue. I think the important point to emphasize on standing is that this is an as-applied challenge. It's a challenge to particular accounting decisions that were made with respect to two releases. There's no real record as to the accounting decisions here, are there? There is an administrative record, and I think the key document in the administrative record. Hasn't the federal agency parties conceded the point when they conceded in front of the district court judge that their treatment of the waters here results in a reduction of available water to the water agencies? So why wouldn't they have standing? No, I don't think we've conceded that. The treatment of these two releases, the accounting for it, really has no connection with the harm asserted, which is less water south of Delta. Where in the record is that established? Well, I think it is the plaintiff's burden to come forward with evidence in response to our summary judgment motion. On your concession that the reduction, the treatment of water in this faction reduces the amount of water that's available, and so therefore it doesn't take a rocket science to say if there's a reduced amount of water available, they suffer. I don't think.  Well, I would point to the fact that these two accounting decisions, what they meant, the end result in the real world was that Interior was able to release some water up on Clear Creek for salmon production there, and that that has nothing to do with the water available to these plaintiffs. Clear Creek wasn't one of the releases that are the subject of this situation. In fact, Clear Creek was treated as a B2. Right. But here, the Nimbus and the New Melones weren't treated. I think the question as to why there was a difference in treatment as to Clear Creek as opposed to these, but that will be a question you can answer later. But what is the evidence in regards to how the waters are accounted for? Well, I think the important thing is they are not challenging the propriety of the releases. They are only challenging the propriety of how it was accounted. So the question is, how does that accounting affect their interests? And the only way, I mean, what they say about how that accounting affects their interests is in the declaration of Mr. Snow, and he says on causation that Interior's claims of discretion to not count fish actions under the WQCP creates the potential that Interior will take other additional fish actions pursuant to B2. Such actions can and often do result in reduced CBP supply to south of Delta. That's their expert. The problem is what he is contesting there is our general claim of discretion. That might have been enough to get them standing in the first round of this case where they were challenging that discretion. But this Court's 2004 decision determines that Interior does have discretion not to count certain releases against B2 if that's necessary to support the primary purposes of the Act. This case only focuses on these two particular releases and how they were accounted for. I think the challenge that they're bringing is broader than that. They're basically saying that's not what we decided earlier. Well, perhaps it is. That's their challenge, it seems to me, that they've got standing because if it's true that we didn't decide quite the way you say we decided, this may have some real impact on them. If that's the case, if they are challenging Interior's discretion generally, then... Or if they're challenging your interpretation of our order that you just described. Right. So let me go directly to that. I think what this Court made clear in its 2004 decision is that Interior does have the discretion not to count certain releases that are made for water quality control purposes. I think this Court recognized that WQRCP actions do generally help fisheries and the Bay Delta Estuary, but in a general way. And the Court realized that if all of those actions had to be accounted for as B2 actions, there would not be water left to carry out the primary... Judge Smith's last question in regards to the prior position of the agency in regards to the 19... What was it? The letter and et cetera. Right. There seemed to be a change of position all of a sudden, a post hoc change of position. Well, two things on that. First, I think what those documents are saying is that it may well be appropriate for Interior to account for water quality releases as B2 releases because many of them do support anadromous fish. And in fact, in 2004, Interior accounted for, I think, 500,000 acre feet of releases for WQCP requirements as B2 water. It depends on the circumstances. And at the end of the year, when it had to make these two releases to meet the Vernalis Flow and the Delta Outflow objectives, those particular releases had very little to do with anadromous fish doubling or any of the other specific purposes. I want to get back, though, to the same thing I did with Mr. Birmingham, and that is what the standard is. Does the Interior Department agree that the district court properly construed our cases and the statute in announcing the, if you will, the governing standard for how water released under this program is to be accounted for? Yes. We think the district court got it right. If that's the case, how do you cabin this? I mean, it seems to me the statute refers to 800,000 acre feet, a lot of water, but it wasn't obviously enough in the time period we're talking about. But where does it end? What's the grand total of water we're talking about in the whole system? How many millions of acre feet are we talking about? I don't know the exact figure, but it's a heck of a lot more than 800,000. It's millions, millions. Let's say it's 15 million. It's probably close to that. What's to stop Interior, under the standard that the district court announced here, from taking half that total and saying, you know, in order to meet the requirements of the statute here, we've got to have more salmon, so we need 7 million acre feet. But we're not going to count that toward B2. But because this is a priority, we're going to leave all of the farmers or a lot of the farmers and the towns downstream. You know, they can just suck air. That's too bad because the statute gives us this priority. Is that a correct interpretation of the district court's ruling? Well, I think the district court recognized that there is a limit on interior's discretion, and that is the statutory language that it can only refrain from not counting these against B2 where that is necessary to support the primary purposes. That's where I get back to this. Let's just say, I mean, it's well recognized that salmon are hurting, really, really hurting. And let's say that the experts at the Department of the Interior concluded that in order to save the salmon, you need 4 million additional acre feet. Is there anything under the district court's standard that would forbid it from doing so? Well, I think that sort of action would be aimed directly at one of the primary purposes of the CBPI, and they would have to. It wouldn't stop them, right? No, no. In that case, they would have to account for that as B2 water. Well, they would. Yes, right. Because the whole purpose was to help the salmon, right? The predominant purpose is one of the specific purposes of the act, which is salmon doubling, which sounds like that would be. They would have to account for that as B2 water. So if that's correct, then why did the Interior not mistakenly take 9,100 additional acre feet in this case? Because that also was predominantly done to benefit the fish. No, under the expert discretion of the agency, they determined that the predominant purpose was not for the What was the next post facto rationalization? Well, I think if you look at the record, and it's important to keep in mind that this was 2004. This court's decision came out right in the middle of the year, and so we don't have maybe as developed a narrative as one might want. But if you look at in our supplemental excerpt to the record, this is page 17. It's this chart, and it was done at the end of the year to explain. Is that on your brief? I'm sorry. It's in the supplemental excerpts of record. I didn't bring those to the bench with me. Page 17 of our supplemental excerpts of record. It's administrative record 2565, but I think it's a key. I don't mean to distract you too much on this, but I want to get back to this point about the post hoc rationalization. Again, citing this November 22, 2004 letter, the department said, counting CBP water used for the 1995 WQCP fishery actions, which further the CBPIA's primary restoration purposes towards Interior's B2 obligation  Doing that, it should have been counted as B2 water, should it not? No, because these particular releases did not further those primary purposes. But that's talking generally. It's not talking about particularly. As far as I'm concerned, it refers to the Can I interject here? It says further the primary purpose, but we understand what the primary purpose is. The question is not whether it furthers it. The question is whether it has the predominant purpose of furthering. If it furthers, that's discretionary only if the predominant purpose is to purpose. Does it require it to be an offset of B2? And that doesn't say predominant. It says furthers the primary purpose. We all know what the primary purpose is. The question is whether or not it is predominantly the purpose to further that purpose. Right, and I think that predominant Have I understood that correctly? Yes, and I think that predominant purpose test gets at the nub of this, which is that water, when it's released, has a lot of different benefits. And when you release it in a place like Clear Creek in June, the predominant benefit is for salmon. But if you're releasing it in June from New Melones or from Nimbus, very little of the benefit there would go towards the specific primary purposes of the Act. Most of it would go to just general habitat benefits. And it's only when it goes to general habitat benefits that Interior feels that it has the discretion, under this Court's decision, not to account for that as B2 water. Most of the WQCP releases it accounts for as B2 water, and that's why. Predominant versus primary issues, the one that was referred to you by your opposing counsel, this is the district judge's interpretation of our case law and the statute. Is that correct? That's correct, and we think it's right. I don't want to take time away, so unless there are other questions, thank you. Thank you very much. Good morning. I may ask for a little technical assistance. We're not going to count this against your time. We're about to get some expert assistance. Thank you. I often feel like I should travel with a box, but I neglected to this morning. Thank you so much. Thank you. May it please the Court, I'm Cynthia Kohler with the Environmental Defense Fund. I'm here today representing all environmental and fishing organization appellees. Just to clear the record, we are not defendant interviewers. We've been plaintiffs in this action for the last 13 years of its existence. In many ways, this is a somewhat simple case, although I do see the stacks of paper on your desks. And it boils down to the three categories that the government just described to you, of the ways that Interior allocates this 800,000 acre feet of water each year. And this is a chart that is also in the Environmental Party Supplemental Excerpts of Record at 456 and described in our brief throughout, but in particular on page 25. When was that chart first utilized? In our excerpts of record, it is... Oh, by the agency. I'm sorry? The agency. I thought that you were pointing to the agency. It is the same chart. We happen to put it in our excerpts of record as well. I just have the reference in our... When did the agency first start utilizing that type of categorization, to your knowledge? To my... I don't know. I'm sorry. But this was prepared during the 2004 water year itself, right around the end of that year, to describe how the water was released. So the three categories are water that's used for... And to clarify, there seems to be some confusion about the Environmental Party's position on the relationship between the Fish Doubling Plan and this B2 water. So just to be clear, we agree that the B2 water does not need to be used only to implement that plan. I don't want there to be any confusion about that. Simply that the statute requires, and as this court previously determined, that that water be used primarily to implement the CVPIA's own restoration mandate, which includes the Salmon Doubling Plan. There are other aspects. That word primarily, which is the statutory word... Exactly. ...relate to predominantly that the district court... Do you view those as being substantially equivalent, or are they different? I do, Justice Smith, believe they are substantially equivalent. I think the way that it works is that Congress said, we want to create a chunk of water, and we want to fix some of the problems that the CVP has created for the environment. But we know that some of the things in the Endangered Species Act and the Clean Water Act will overlap with that. So we're going to be as clear as they could have been, and they said, we want this water to be used for the primary purpose of our own brand new restoration mandate. Which is the 800,000 acre feet specified B2 water, right? I'm sorry, I'm not being clear. The 800,000 acre feet needs to be used for something. And the main purpose, the primary purpose of that, is implementing the CVPIA's own new restoration mandate, and that includes the fish doubling, the Salmon Doubling Plan. It includes other things as well. We tend to use the Salmon Doubling Plan as a shorthand, because that is the one piece of Congress's new restoration mandate that specifically requires Interior to use this B2 water. When the agency, the Department of the Interior, specifically refers to carrying out that part of the plan, is it fair to say that under your interpretation, and certainly our case law interpretation, that it should be B2 water? Yes, absolutely. So, you know, if you were drawing the Venn diagram, you'd have two overlapping circles, and there would be a chunk in the middle where implementing the Salmon Doubling Plan would be completely coterminous with implementing aspects of the Water Quality Control Plan. There would also be a crescent on the side where implementing the Water Quality Control Plan would have very little to do with the CVPIA's own restoration mandate. I agree with you about that. If there are writings from the Department of the Interior, such as the November 22, 2004 letter, which at least arguably says that our purpose in doing the set-aside there was, I should quote it exactly, was used for 1995 WQCP fishery actions, which further the CVPIA's primary restoration purposes, does that mean that it was in fact intended originally to be B2 water? I don't believe so, because it is the biologists on the ground who have submitted sworn testimony in this case saying that they would not have made those releases. You also have other testimony that the lower court found these releases were not made primarily for salmon. There weren't even salmon in the river at the time. The lower court found that there was uncontroverted evidence on the other side. Is it possible that the higher-ups maybe didn't understand what was going on? That's never happened, I'm sure. I can't speak to what the higher-ups understood. I can say that that letter was written prior to this court's… The letter doesn't address specifically the June 2004 releases. It does not. It does not. It's a very unilateral situation. But I also want to come back to my listed point. They refer to the primary purpose of the statute. Yes. And this furthers, they say, the primary purpose of the statute. That's what they say. But the question is whether its predominant purpose is to further the primary purpose of the statute. And you're saying that was not its predominant purpose. The predominant purpose of the 9100 releases was not to implement either the Salmon Restoration Plan or any other CVPIA purpose. Even though it had some effect of furthering the primary purpose. Right. Releases into the environment. And I think here you're really reaching to the nub of where we disagree with the Water District's view of the law.  They're saying that any release of water into the environment that in a general way benefits fish or furthers fish and wildlife restoration is per se implementation of the CVPIA's own restoration mandate. And we disagree with that. That is not… Well, that has to do with the argument that I was quite struck by that the statute doesn't really differentiate substantially between anadromous fish, yet the department has privileged salmon. How do you justify when we're talking about predominant purpose and you say, well, you know, it may have helped the sturgeon downstream but it didn't help the salmon or it didn't help them very much and therefore it couldn't have been the predominant purpose. That's, I think, a fair summary of his argument. Right. I think this is in some ways a semantic issue. The statute requires that interior double anadromous fish in Central Valley streams by the year 2002, which, of course, has not occurred. And that one says it has to double anadromous fish. Does that mean sturgeon? All anadromous fish. It is my understanding that the anadromous fish restoration plan covers all anadromous fish. Pursuant to the statute, the agency has prepared an anadromous fish restoration plan, the AFRP, which we submitted a request for additional notice in connection with our briefing. That is the plan that guides what the agency determines is an anadromous fish restoration program and which is not. So, again, this is a matter of shorthand. We tend to refer to the AFRP as a salmon doubling plan. But, of course, it is the statutory mandate and the AFRP itself covers what is required. So when we talk about what is necessary to implement that plan, we are talking about, we are within the primary purpose. In this case, these releases were made pursuant to the water quality control plan when there were not, when the biologist in charge would not otherwise have made those releases to implement, primarily to implement the anadromous fish restoration plan. So I don't think there is any factual dispute there and certainly the lower court did not find one. These releases were made specifically to meet water quality control plan requirements that are in that outside crescent, the ones that do not overlap. If I understand your answer, your answer does not depend upon some privileging of salmon over sturgeon. No, I, this is the first I have heard that and I, you know, unfortunately we can't, you know, we don't have the opportunity to present you with the new evidence, but that is not my understanding of the way that the agencies made this decision. So, I'm not sure if I may have used up all of my time. You are now at 42, 43, 44 seconds. Maybe if I could make just this one last point. One last point, please. Which is that within these three categories, Congress did not need to create this dedication of water to implement the Endangered Species Act or the Water Quality Control Plan. The CVP was subject to those statutes. So what's really at issue here is the extent to which the interior is going to be limited in its discretion to over count. I want to speak if I could very quickly to the issue of where does it stop because I think that's a very fair and extremely important question. And I think the answer lies outside of the CVPIA. The answer is that the Water Quality Control Plan and the Endangered Act have their own sets of administrative discretion that go along with them. In this, this statute does not create some sort of unlimited power on the part of the government. What it does create is an 800,000 acre foot dedication that must be used primarily for the CVPIA's own restoration mandate. To the extent that interior is required to use that water, or most of it as this court found previously, to implement those other statutes in a way that does not predominantly advance this new restoration mandate, that takes away from that mandate. And as we've seen, we are far, far from reaching the salmon doubling goal. And in fact, and I think the government mentioned this and it bears emphasizing, in fact the government goes out of its way to accommodate the water districts on this. And each year, and this year in particular, uses a great deal of this water, 40% of this secondary purpose for these non-primary purpose issues. Thank you very much. I appreciate the clerk's indulgence. Thank you. Why don't we give you three minutes for rebuttal. I think that will probably be about a fair allocation. I can't allocate water, but I can allocate time. Thank you, Judge Fletcher. Let's go directly to the heart of this question. We're talking about two actions here. A release from New Melones to meet the Vernalis standard, and releases from Nimbus to meet a delta outflow standard. Where do those originally appear? I would refer the court to the Bay Delta Accord, and specifically attachment B to the Bay Delta Accord, which is in the excerpt of the record at page 807. That is where the fish flow for Vernalis first appears. And what does that attachment say? Water quality conditions shall be maintained together with other measures in the watershed sufficient to achieve a doubling of production of Chinook salmon. Consistent with the mandates of federal and state law. The only mandate of federal law that deals with fish doubling is 3406B1. And then, in the very next paragraph, is the first reference to the flow standard for Vernalis in the month of June. It is the predominant purpose when this was created in 1994. Pardon me? What page are you referring to? 807, Your Honor. All right. The predominant purpose when this was created was to promote the primary purpose of the act. Now, what happened in 2004, they were going along, and contrary to what counsel for the United States said, this wasn't an action taken at the end of the year. These were actions right in the middle of 2004. And what they said was, well, gosh, we made the releases in June. Now we're not going to have enough water to make releases in Clear Creek. We just won't count that water in June because it was incorporated into the water quality control plan. Let me ask you this. Assume for the moment that I agree with you that, in fact, that water was released for the predominant purpose of helping anadromous fish and is therefore B2 water and was therefore incorrectly allocated. Why do we care now? Because it seems to me that what we care now about and what you're arguing about for the future is the principle of predominant purpose, and maybe they made a mistake, maybe they were wrong, maybe your client should have gotten a little more water than them. So what? Your Honor, what we are concerned with, and this goes to Judge Smith's question, where is the limit? What this court said in its last opinion was that if releases are made in the American River for the benefit of anadromous fish, they must be counted. But let's assume hypothetically, in fact, this has occurred. It's outside the record, but as an officer of the court I'll represent, this has occurred. But hypothetically, let's assume that Interior comes up with a new standard for flows on the lower American River for the benefit of fish, for the benefit of anadromous fish. And then they say, but we don't want to have to comply with the Ninth Circuit's opinion, so we're going to go to the State Water Resources Control Board and ask them to make that a condition of our permit, which takes it outside of the primary purpose. The action is still fulfilling the primary purpose, but they wouldn't have to count it under the argument that's being advanced by counsel for the United States and for the environmental plaintiffs. It sounds to me like your law firm will be well employed for many years to come. Your Honor, with the court's permission, for the benefit of the law students, I made an observation to an associate yesterday that I've been practicing water law for 25 or 30 years, and you're absolutely right. The first real water law case that I worked on in 1986 was a continuation of the successors of Lux versus the successors of Hagen. Lux versus Hagen was an 1856 California Supreme Court decision, and in 1986 their successors were still arguing about the same one. There's been more blood shed over water in California than over gold, by a long shot. And if you run out of work here, go on up to Pyramid Lake. Thank you, Your Honor. Thank both. Nice arguments on both sides. The case of San Luis Yandelta-Mendota Water Authority versus the United States is now submitted for decision.
judges: Wu, Fletcher W. , Smith M.